Gertrude Paolinelli, Administratrix of Estate of Leo Jerry Paolinelli, Deceased, Appellee, v. Dainty Foods Manufacturers, Inc., Appellant.

Gen. No. 42,808.

Heard in the third division of this court for the first district at the October term, 1943. Opinion filed April 26, 1944.

LORD, BISSELL & KADYK, of Chicago, for appellant; LEONARD F. MARTIN, GUY C. BALTZ and JAMES J. LEWIS, all of Chicago, of counsel.

SHER & KARLIN and M. M. WASSERMAN, all of Chicago, for appellee; LEO S. KARLIN, of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

Gertrude Paolinelli, administratrix of the estate of Leo Jerry Paolinelli, deceased, filed a complaint in the superior court of Cook county against Dainty Foods Manufacturers, Inc., for damages under the Wrongful Death Act. A trial before the court and a jury resulted in a verdict against defendant for $3,000. Motions for judgment notwithstanding the verdict, for a new trial and in arrest of judgment were denied, and judgment was entered on the verdict. This appeal followed. Plaintiff's theory of the case is that she purchased in a neighborhood store Dainty Soup Noodle Mix, manufactured by defendant; pre-

pared soup from the mix and fed some to her young son, Leo Jerry Paolinelli; that due to the negligence of the defendant a bone or foreign object was in the Dainty Soup Noodle Mix and was fed by her to Leo causing injury to his respiratory system and resulting in his death. Defendant's theory is that there is no evidence showing that the bone or foreign object was present in defendant's product at the time plaintiff purchased it; that no negligence on the part of the defendant was proved or can be presumed from the proof; and that the verdict was the result of mere speculation and conjecture on the part of the jury.

On Saturday, December 7, 1940 Leo Paolinelli and Gertrude Paolinelli resided at 1901 West Race street, Chicago, with their daughter Carol, 4½ years of age, and their son Leo Jerry, 13 months of age. The baby was recovering from an attack of chickenpox. He had reached the age where he could walk with help if he held onto somebody. During most of the week of December 7th, plaintiff kept the baby in a walker because it was very cold and the flat downstairs was not heated. With the aid of the walker he would go from one part of the house to the other. Plaintiff testified that on December 7th, in preparing supper for her family, she warmed up some soup from the day before. The soup was beef broth which plaintiff had prepared herself from chuck meat bought in the neighborhood. She discovered that she needed food for the baby and went to a neighborhood grocery store and purchased a glass jar containing Dainty Soup Noodle Mix, manufactured by the defendant. On direct examination plaintiff testified that she took a clean pan from the pantry, boiled some water in it, and prepared the noodle mix soup by putting the contents of the jar in the boiling water and letting it boil five to ten minutes, and that when prepared she poured a little soup and most of the noodles from the jar into a dish that she had "specially for the baby." At the time

she bought the jar it was sealed with a lid on it. While in her home she pried the lid off with a can opener and poured the contents into the pan. She watched the soup mix while it was cooking, stating that "otherwise the noodles would stick to the bottom." She stirred the soup mix while it was boiling. As a consequence of the boiling of the mix the noodles increased to about three times their size. The noodles were shell shaped. She testified that they were from one half to three quarters of an inch long and about one quarter inch wide, and that she combined the meat broth from the day before with the noodle mix soup remaining after filling the baby's dish. This combination she intended to serve to her husband, her daughter and herself. She also fried meat for supper. The broth from the day before was made from tomatoes as well as some vegetables and the beef chuck which she had put in solid without cutting it. The meat was taken out the day before. For the reason that her husband did not like vegetables or tomatoes, she strained this left over soup through a tea strainer before serving. The water used to prepare the noodle mix soup was taken from the sink. The sink faucet was provided with a filter strainer. She did not know how big the openings were in the strainer on the faucet, but said a noodle could not pass, and doubted whether anything one quarter or one third of an inch could pass through the strainer. Plaintiff's husband then started to eat and plaintiff started to feed the infant. She testified that she took a teaspoon and fed him two or three teaspoonfuls; that about the second or third teaspoonful he gagged; that he started coughing and began turning blue; that her husband took the baby, turned him upside down, patted him on the back, and that the baby "threw up some of the noodles and some of the soup"; that then he lost his bluish color and stopped gagging. She took the baby from her husband and held him in her arms. He started to cry and his cry

was "quite a bit different from his ordinary cry. It was sort of like his voice came from way down deep inside of him." Plaintiff immediately called a physician named Dr. Block. This call was made at 6:30 or 7:00 p. m. The feeding of the baby was around 6:00 or 6:30 p. m. Dr. Block did not arrive until about 7:00 p. m. He undressed the baby, laid him on the table and examined him with a stethoscope. He told the parents to wait until Sunday or Monday. After the doctor left plaintiff held the baby in her arms because he was restless. He would not take his bottle. Finally he fell asleep in her arms and she laid him down. All night long he was dozing off and on. In the morning when the mother tried to give him orange juice, water and milk he would not take it. She testified that Sunday afternoon she noticed that the baby's breathing was becoming heavier and that his cry was becoming harsh. On Sunday the mother held him in her arms until 2:00 p. m. and he fell asleep until 5:00 p. m. When he woke up his breathing was much worse and when he breathed "his whole chest would cave in so you could see his ribs and his cry—he couldn't even cry any more." She called up the doctor and was told to take the baby to the County hospital. She arrived there about 7:30 p. m. on Sunday. The mother next saw the baby at 12 o'clock noon on Monday. He seemed to be dozing and was restless. She saw him again at 7:30 Monday evening while he was getting a blood transfusion. The baby died about 10:20 that evening.

Dr. Willard Kerman testified that he was a licensed physician and at the time of the occurrence was a resident physician in the children's department of the Cook County hospital. He looked at the child shortly before midnight on Sunday and observed that the child was in acute respiratory distress and was having difficulty in breathing. The child had chickenpox at the time. The baby was bronchoscoped by another doctor at 3:00 o'clock Monday morning, and by this

means a grayish mass was removed from the right main bronchus. Dr. Kerman said the grayish mass was flat like a disc and measured about a half inch in length, one third of an inch in width and that it was maybe one quarter of an inch thick, with irregular borders; that it seemed hard and brittle and was porous in character; that it was shaped roughly like a pill—like an aspirin tablet. In his opinion it was bone. He thought Dr. Freedburg took it. He observed during the bronchoscopy that the lining of the respiratory tract was redder than normal and described it as angry, inflamed and edematous and swollen. After the bronchoscopy the baby was returned to his bed and a steam tent was arranged over it so as to sooth the inflamed respiratory tract. Though apparently improving, following the bronchoscopy, the child grew worse, and about noon Monday it was decided that a tracheotomy, that is, a mechanical opening in the trachea or windpipe, would have to be made, and it was done at once. Around supper time a transfusion was started and ran a couple of hours until its completion. The child seemed quite "bad" but got progressively worse and suddenly "went bad" about 10:15 and died in five minutes. The witness's opinion as to the medical condition of the child immediately before his death was that he had an acute laryngotracheobronchitis. That means an inflammation of the entire respiratory tract, starting with the larynx or voice box through the trachea or windpipe, down into the bronchi. The witness "thought" there was a causal connection between the death and the obstruction found in the bronchi. He "felt" that the inflammation and swelling was due to the foreign object and "felt" positive that death was due to the progressive inflammation. The final diagnosis was made on the basis of witness's observation, plus the autopsy findings.

On cross-examination plaintiff testified that on December 7th she fed the baby cereal and a mashed banana. Asked: "Did he eat any bread?", she an-

swered: "No, he chewed on a graham cracker." Defendant states that the evidence shows the infant was chewing on a graham cracker at the time or shortly prior to the time plaintiff started feeding him. We agree with plaintiff that a reading of the transcript leads to the conclusion that the mother, in stating that her child chewed on a graham cracker, was relating what he ate on December 7th. At the time the mother gave this answer, she was relating what she fed the baby on that day. Defendant also states the evidence shows that at the time plaintiff was preparing the soup, she was preparing meat for supper. Plaintiff replies that it is clear from her testimony that the meat must have been prepared either before she went to the store or after she fed the baby, and that no where is there any evidence from which it could be inferred that any meat was being prepared during the time she was preparing the soup mix. Our view is that the jury was in the best position to determine when she was frying the meat.

Plaintiff was cross-examined as to her testimony before the coroner's jury the day following the baby's death. She testified that the facts were all fresh in her mind at that time. One question asked her at the inquest was: "Were you feeding him these packaged noodles or something you had bought and broke up yourself?" She answered: "No, I put two things together. I had some soup left over from the day before and I had noodles in it and they got kind of thick and I went to the store and bought some chicken noodle soup in a jar. If it is a chicken bone I cannot understand how it got there because I didn't have chicken. I had regular broth and soup meat and the doctor said it was a chicken bone." Asked as to whether she recalled the question and answer, she answered in the affirmative. Asked: "That was true wasn't it?" she answered: "True what I said about it?" The interrogator said: "Yes," and she answered: "Yes."

Asked "And you had mixed both the chicken soup and the other soup together and fed him a part of that?" She answered: "I didn't mean it that way." Counsel for defendant then informed her that he was not asking her what she meant, that he was asking her whether the questions were put and the answers made. She started to answer: "I fed the baby only—," when defendant's counsel asked her whether she knew what the coroner meant when he asked: "Were you feeding him these packaged noodles or something you bought and broke up yourself?", and whether she understood that the coroner asked: "What were you feeding the baby?" She answered: "I must have." Asked: "And did you still understand that when you said, 'No, I put two things together?'" she answered: "Yes." Asked whether the following question was asked and the following answer given before the coroner: "The soup you had on the day before, you say it didn't contain chicken?", "No, it didn't and I strained the soup from the day before because I didn't want—my husband don't like anything with tomatoes in it and I strained it. So I cannot understand how he could have swallowed a bone. That is why I never thought—I never told the doctor. He even asked me in the hospital if he swallowed a bone and I said, 'Not that I know of.' Since I did not have chicken in the house since Thanksgiving, so it could not have been that", she answered: "That is right." Asked: "You fed him the mixture?", she answered: "Yes." Asked: "Had you fed the mixture of the two kinds of soup you put together?", she answered: "Whatever I told the inquest." She followed with the statement, "I did say that but I was all bewildered at the time, all mixed up."

Defendant's plant was located at 670 West Randolph street, Chicago, and it made two kinds of soup, chicken noodle soup and noodle soup without chicken. It also made a powdered drink concentrate. The noodle soup

mix which defendant manufactures is composed of dehydrated vegetables, protein derivatives, chicken fat, flour Seminole and gelatin. The dehydrated vegetables look like dried apricots or dried figs and come in cans or boxes of 30 or 50 pounds, and are taken directly from the boxes and put into the first mixer. Defendants relied on the persons who sold the dehydrated vegetables to clean them. No inspection was made except to see if they were of proper cost. All the cans are sealed. The boxes are closed and the contents are wrapped in paper to prevent absorption of moisture. The particles of dehydrated vegetables are the size of corn meal. The noodles are delivered in paper containers weighing 50 pounds. The chicken fat, prepared by the Polo Products Company, is delivered in 25 or 30 pound cans and comes frozen. Each can of chicken fat bears a government inspection mark for grade and purity. The gelatin and spices come in powdered form. The packages are opened on the second floor of defendant's plant, where they are mixed. The plant was 125 feet deep and 50 feet wide and had a wooden floor. Marble tables were used. The walls were ordinary walls and were painted. Before adding the chicken fat certain amounts of the ingredients are weighed out of each package and put directly into a mixer, which is a closed bowl and contains 300 pounds. It is sort of an oversized Mixmaster, about 3 feet in diameter. In this mixer the ingredients are mixed to the right proportions. This mix is taken out of the first mixer and put in another mixer holding about 62 pounds. At this time a can of chicken fat is put in hot water to make it liquid, the whole can being put in and warmed like a baby's bottle. One and one half pounds of this liquid fat or oil is then added to the vegetable mix with a tin scoop made like a spoon. After this mixer mixes the fat with the other ingredients the bowl is taken off the mixer and carried into another room. In

this room the powder mix, so-called, is taken out of the mixer bowl with a scoop holding 2 or 3 pounds and put on big plates. It is then weighed out, either by hand or by means of a hopper and put in open glasses. One and one half ounces of the mix is put in each glass. The glasses were then carried on trays to the noodle department, where girls put the noodles in by hand. The glasses are then sealed by a machine with a vacuum pack cover and are sent out in that shape to the persons who handle the product. No inspection is made of the contents of the fat and no inspection is made to look for foreign objects. The second mixer, where the fat is added, was not a grinder and would not grind up something really hard. A little piece of wood or bone would not grind; it would go through the mixer and come out the same shape it was before. The mixed powder in its final form was not run through a strainer, but was put in the glasses without being strained. The only part of the Dainty Noodle Soup Mix which contains any animal or meat products is the chicken oil or fat, and the only portion of chicken defendant had at its factory was chicken fats. No other meat product was used by defendant in its two soup products and none was used in its drink concentrate product. It had no animal bones of any kind about the premises and none of its tools or any part of its establishment was made of animal bones. The defendant had never found a bone in the noodle mix. Neither the plaintiff nor anyone in her behalf ever showed the defendant a foreign object, such as was claimed to be in the noodle mix, the container or the contents. The Polo Products Company, which supplied the rendered chicken fat to the defendant, received live chickens, killed and dressed them, and removed the fat from the gizzards and entrails of the chickens. The fat is then heated to separate the oil from the flesh and the oil is drained from the receptacle. The oil is then strained or sieved and is poured

into cans containing from 25 to 30 pounds of chicken oil. A United States government meat inspector is present during the process and inspects the chicken fat and approves and stamps all the chicken oils sold by the Polo Products Company. No part of the chicken is used by the Polo Products Company except the chicken fat. The balance of each chicken is disposed of without any further processing by them.

The first point urged by defendant is that the trial court should have directed a verdict for it, or entered judgment for it notwithstanding the verdict because there was no evidence showing that the bone or foreign object alleged to have caused the injury was in the noodle mix product when its container was opened. Plaintiff insists that the trial court properly overruled the motions for a directed verdict and for judgment notwithstanding the verdict on the question of the presence of a bone or foreign object in the noodle mix product when its container was opened. By a motion to direct a verdict at the close of all the evidence, the sole question presented is whether, admitting the evidence in favor of the plaintiff to be true, that evidence, together with all legitimate conclusions and inferences, fairly tends to sustain plaintiff's cause of action. If it does, then as a matter of law, plaintiff is entitled to have her case passed upon by the jury. By a motion for judgment notwithstanding the verdict, the same question is again presented and the same test applied as in deciding a motion for a directed verdict at the close of all the evidence. The evidence clearly shows that the baby's death was caused by a bone which lodged in his respiratory system. Dr. Kerman testified that the bone was grayish in color, flat like a disc, and measured about one half inch in length, one third inch in width and about one quarter inch thick with irregular edges. In endeavoring to impeach the mother, she was asked about her testimony before the coroner's jury. In that testimony she is quoted

as saying that "the doctor said it was a chicken bone." However, in his testimony Dr. Kerman did not say it was a chicken bone. It was the duty of the defendant to exercise at least reasonable care in the manufacture, preparation, inspection and packing of its food product, so that such product, knowingly to be distributed by it for human consumption should be free from any foreign objects not fit for human consumption. The evidence shows that the bone which eventually caused the baby's death was first noticed by the parents at about 6:30 Saturday evening. At that time he gagged after having been fed two or three spoonsful from the contents of his dish. If the bone did not come from the jar of noodle soup mix, defendant cannot be held responsible. If the bone did come from the jar of noodle soup mix, the verdict of the jury should stand. If the bone came from the jar, that would be strong evidence that there was an omission on the part of defendant's servants to observe some of the precautions about which they testified as to the preparation and filling of the jars. Defendant states that no inference that the bone was in its product can be drawn from the mere fact of feeding the soup. Plaintiff's case rests largely on circumstantial evidence. However, a verdict may be founded on circumstantial evidence alone. Negligence is always a question of fact that must be alleged and proved as averred. It cannot be supported by mere conjecture or surmise. We agree with defendant that liability cannot rest upon imagination, speculation or conjecture, or upon a choice between two views equally compatible with the evidence, but must be based upon facts established by evidence fairly tending to prove them. Absolute, positive, ocular proof the law wisely does not require. A greater or less probability, leading, on the whole, to a satisfactory conclusion, is all that can reasonably be expected to establish controverted facts. Plaintiff testified that she looked at the contents of the jar as she

poured it into the pan to prepare the soup and did not at any time see any bone in the mix, and that she saw no bone in the mix at any time after it had been prepared. Defendant argues that there was no bone in the two or three spoonfuls she fed the baby, or she would have seen it; that the testimony shows that the only portion of the noodle mix that contained any animal or meat product is the chicken fat or oil; that no bones of any kind were kept on defendant's premises; that no bone implements were used in the manufacture of its products and that it knew of no bone having ever been found in the noodle mix; that the chicken oil was purchased by defendant in sealed cans and was government inspected; that plaintiff's own testimony and that of the defendant negatived the existence of any bone in the product, and that the verdict was obviously the result of mere speculation and conjecture on their part that the product contained a bone. Defendant maintains that the bone found in the infant's bronchus came from some outside source; that there is no evidence that it came from defendant's product; and that on the other hand the evidence shows a number of other sources from which it may well have come. Defendant suggests that keeping in mind the well known propensity of young children to place objects in their mouths, the bone may well have been picked up by the boy in his perambulations around the house and kitchen and placed by him in his mouth before the time plaintiff started to feed him; that had ten or fifteen teaspoonfuls been fed to him before he gagged, it would be unlikely that the bone was in his mouth when she started feeding him; that the first or second teaspoonful could readily place the object already in his mouth in such a position that the next spoonful of soup would carry the object down into the throat. In this connection defendant calls attention to the testimony of plaintiff that she did not see any bone in the soup she fed to her son and comments that in view of

the small capacity of a teaspoon 'and because the mother of necessity must have looked at the spoon and contents in order to insert it in the baby's mouth, it is extremely unlikely that if the bone had been in a spoonful of soup she would not have seen it.

Defendant calls attention to the direct examination of plaintiff wherein she testified she prepared the noodle soup mix by pouring the contents of the jar into a pan of boiling water, stirring it for five or ten minutes, and then pouring a portion of the contents of the pan into a dish which she had specially for the baby, and which she then set aside while preparing soup for the rest of the family; that she had some left over meat broth from the day before to which she added the balance of the contents of the pan of noodle soup mix and then poured it in plates for the rest of the family, following which she commenced to feed the baby. Defendant, alluding to the testimony of plaintiff before the coroner's jury, asserts that she admitted on the trial that she fed the baby a mixture of the broth left over from the day before and the chicken noodle soup mix, and that the conclusion seems irresistible that if the bone which later lodged in the baby's throat was not in his mouth at the time she started feeding him, it in all probability was in the meat broth which she mixed with defendant's product. Referring to her testimony that she strained the meat broth which contained tomatoes and other vegetables, because her husband did not like anything with tomatoes in it, defendant states that she also testified that she saw no bone in the noodle mix, either as she was pouring it into the pan or in the soup which she fed to the baby, and that it can be as well inferred, if inferences are to be permitted, that the bone came from the meat broth which she combined with the noodle soup mix to feed the baby, as that it came from the noodle soup mix. Defendant asserts that there are other sources from which the jury could as well have specu-

lated the bone came from as from defendant's pro-
duct; that the baby chewed on a graham cracker; that
the bone my have been in the cracker; that according
to plaintiff she put water in a pan and waited for it to
boil and then added the noodle mix and stirred it for
five or ten minutes while it was boiling; that she later
poured some of the soup into the baby's dish and set
it aside; that the time she was preparing the soup she
was frying meat for supper; that the pan in which she
put the water was not covered; that it apparently was
on the stove on which she was frying the meat; that the
bone may have gotten into the soup while she was stir-
ring it; that it may have come from the baby's dish
while she was stirring it, or it may have come from the
meat she was frying. Defendant states that the verdict
was the result of mere speculation; that the jury
simply surmised that the bone entered the baby's
mouth at the time he was fed and that it came from de-
fendant's product; that there were no facts from
which either inference could be drawn; that it was
equally compatible with the evidence either that the
bone was in the child's mouth when the mother started
to feed him, or that it came from one of the outside
sources suggested; and that plaintiff has not sustained
the burden of proof which was upon her throughout to
show that the bone came from the defendant's prod-
uct.

The evidence shows that around supper time plain-
tiff started to prepare the meal. She had a clear broth
soup made from chuck meat and vegetables the day
before. She had bought the meat and made the soup
the day before. She had examined the meat and it had
no bones in it. The meat had been taken out of the soup
the day before. On Saturday she took the little bit of
soup she had left over from the day before and put it
on the stove and saw she had nothing to feed the baby.
She went to a neighborhood store and saw defendant's
product on the shelf and bought it. The product was

in a glass jar containing dehydrated vegetables, some dried powder, and on top were · the shell noodles. When she bought the jar it was sealed. When she got the jar home she took a clean pan from the pantry and filled it with the required amount of water, which she obtained from the sink faucet. The faucet had a filter strainer on it, through the openings of which a noodle could not have passed. She did not know how big the openings in the strainer were, but doubted that anything one quarter or one third of an inch could pass through. Then she waited for the water to boil. When the water boiled she put in the entire contents of the jar and let it boil five or ten minutes. She had pried open the jar with a can opener. When she poured the contents of the jar into the pan of water, she just looked at it when she poured it in and did not see any bone either in the mix or in the soup. She did not put any lid over the pan and its contents. She had to stay and watch it while it was cooking, otherwise the noodles would stick to the bottom. She stirred it while it was boiling. When it was boiled the noodles increased to about three times their previous size and were one half to three quarters or seven eighths of an inch long and about one quarter inch wide. When the soup was done she took the baby's dish, poured in a little soup and most of the noodles and set it on the side. Then she put the left over broth with the remainder of the chicken noodle soup. The left over broth had been strained through a strainer with very fine openings, through which an object one quarter inch could not go, to strain out the vegetables before serving it to her husband. This soup contained a combination of broth from the day before and the remainder of the soup mix, and was divided among the plates of plaintiff, her husband and the other child. Then plaintiff started to feed the baby and her husband started to eat. She took a teaspoon and fed him two or three spoonfuls, and then about the second or

third spoonful he started to gag and turn blue. Her husband then took the baby and turned him upside down and patted him on the back and the baby threw up some of the noodles and some of the soup. She held the baby in her arms and when he cried the cry was different from the ordinary cry. Later that evening he was visited by Dr. Block and on Sunday evening was taken to the County hospital. He died Monday evening.

With respect to the attempted impeachment of plaintiff, it is the position of the defendant that in the trial court she confirmed the testimony given by her at the inquest, which was to the effect that she had mixed the broth left from the day before with defendant's product. Defendant asserts that this situation is not controlling and should not be confused with cases where a prior inconsistent statement made by a witness, which concededly would affect the credibility of the witness and pose a question for the jury, whereas, in the instant case plaintiff admitted the truth of her previous testimony. Plaintiff states that this testimony was not impeaching; that a clear analysis of the record shows that during the trial plaintiff explained that she actually did not feed the baby a mixture of the beef broth and noodle soup mix. We have carefully read the transcript of the testimony. When the plaintiff was under cross-examination by defendant's attorney she was asked as to whether she mixed any of the left over broth with the noodle soup mix, and she answered: "No." She was again asked substantially the same question and answered: "For my husband I had mixed it." She was also asked: "Did you tell you mixed it for the baby and fed him some of the mixed soup?" She answered: "No, I didn't say it was mixed for my baby." She was then asked about questions propounded to her and her answers before the coroner's jury. After answering that the answer she gave before the coroner's jury

was true, she was asked: "And you had mixed both the chicken soup and the other soup together and fed him a part of that?", to which she answered: "I didn't mean it that way." She was then asked: "I am not asking you what you meant. I am asking you whether the questions and answers were made." She answered: "I fed the baby only —," and was interrupted by another question. However, it is a reasonable inference from her previous answers that she was about to say that she fed the baby only the chicken noodle mix. The attorney for the defendant was not satisfied as to her testimony; otherwise, after she had admitted that her answer before the coroner's jury was true, defendant's attorney would not have asked her whether she had mixed both the chicken soup and the other soup together and fed the baby a part of that. However, when he put this question to her, she stated that she did not mean it that way. When he told her he did not want to know what she meant, she started to answer that she "fed the baby only —." Her statement that if the bone which lodged in the child's throat was a chicken bone she could not understand how it got there because she did not have chicken, was consistent with her theory of the case. She was also asked: "You fed him the mixture?", and she answered: "Yes." From a consideration of the transcript it is apparent that on the trial plaintiff testified that what she fed the child was defendant's mixture and not a mixture of defendant's product and the beef broth left over from the day before. It is our view that whether or not she was impeached and the weight to be given to her testimony, was within the province of the jury. The jury had the right and apparently did accept the mother's version of the occurrence as true. It further appears from the hospital record, which was introduced in evidence, that when the baby was brought to the hospital on Sunday, December 8, 1940, plaintiff gave a history that on Saturday, De-

cember 7th, while being fed chicken noodle soup the child gagged and had to expectorate some of the soup. In the same statement the mother informed the hospital authorities that no bone was present in the soup. This statement was made when she had every reason to hope that her child would recover, and tends to corroborate her testimony that she did not mix defendant's product with the left over beef broth. It also shows that at that time the mother did not suspect that the baby had swallowed a bone. Plaintiff testified that she had no poultry in the house for two or three weeks before the occurrence, and that she had a duck on Thanksgiving day, which was all eaten. Plaintiff points out that the fact that no one saw the bone does not negative its existence in defendant's product; that every step in the handling of this product from the time the sealed jar was opened until it was fed to the baby is reasonably accounted for, and leads to only one conclusion, that it must have been in the original container. It could not come from the water, which was strained. The pan was clean. Plaintiff watched it boil. The soup mix was put in a special baby dish and then fed to the baby. The left over broth contained no meat, and the meat in it the day before contained no bones. If it had been a chicken bone, there had been no poultry in the house for two or three weeks, and then a duck which had been entirely consumed. As to defendant's contention that the baby may have picked up a bone in his perambulations around the house, we agree with plaintiff that this contention is based on nothing in the evidence and is highly speculative. As to defendant's contention that since the baby chewed on a graham cracker, the bone might have been in it, we agree with plaintiff that the jury had a right to conclude from the evidence that this contention is also speculative and improbable. As to the suggestion of defendant that the bone may have come from the meat which was being fried

for supper, we agree with plaintiff that the record does not show that from the time the jar was brought home until the baby was fed, meat was being prepared at the same time. Plaintiff watched the soup mix while it was cooking. We agree with plaintiff that it is logical to conclude that if anything came into the mix from any outside source during the period while she was watching and stirring it, she in all likelihood would have seen it. As to the suggestion that the foreign object may have come from the baby's dish, plaintiff states that she could not and would not have missed seeing it in the baby's dish, if it could have been there. A glass jar similar to the one purchased is in evidence. It is approximately four inches high. Pasted around the jar and one and three quarters inches in width is a label giving the name of the product and instructions on its use. The lower part of this label is approximately five eighths of an inch from the bottom of the jar and the upper part of the label is approximately one and three quarters inches below the top. The label is opaque and plaintiff, in picking it up, could not see the contents from the side so far as covered by the label. A small object such as the bone taken from the baby's bronchus, could have been poured into the pan without being observed by the mother. It would be less likely that an object such as a bone from the beef broth could fall or fly into the pan while the mother was watching it, without her seeing it. It is interesting to note that eleven of the jurors were women, and it would seem that the knowledge of women in the care of the home, the preparation of meals and the feeding of babies would give the jurors in this case a good understanding of the testimony and enable them to appraise it.

In answer to defendant's argument that there was no bone in the two or three teaspoonfuls plaintiff fed the baby or she would have seen it, plaintiff calls attention to her testimony that she poured a little soup

and most of the noodles into the baby's dish and that she fed these noodles to the child, noticing that the noodles floated at the top, and declares that it would be a logical conclusion, the noodles being as large or larger than the bone and floating on top, that the bone could very well have been in the spoon without being seen by plaintiff. These observations by plaintiff have merit and tend to support her case. It is significant that it was after the baby had swallowed some of the soup and noodles and was still being fed that he started to cough and gag. We are of the opinion that under the factual situation disclosed by the record that the court was right in declining to direct a verdict and in declining to enter a judgment for the defendant.

The second point leveled at the judgment is that assuming *arguendo* that there was a bone in the noodle mix product when purchased by plaintiff, there is no evidence whatever to show any negligence of defendant in its manufacture, and the doctrine of *res ipsa loquitur* cannot be invoked to sustain the verdict and judgment. Defendant urges that there is no evidence tending to show that its manufacturing process was conducted otherwise than in a sanitary, safe and efficient manner; that plaintiff's cause of action is based upon negligence of the defendant; that the burden was upon plaintiff to prove negligence and that she failed so to do; and that in the absence of any affirmative proof of negligence plaintiff must necessarily invoke the doctrine of *res ipsa loquitur*. Plaintiff insists that disregarding, for the time being, the doctrine of *res ipsa loquitur*, there was ample evidence establishing the charge of negligence. The evidence shows that the product was prepared and marketed by defendant in a sealed vacuum packed container, delivered in that condition to a retailer, who in turn sold it in that condition to plaintiff, so that when received by plaintiff it necessarily and apparently was in the same condition as when distributed by defend-

ant. A reading of the testimony as to the method used by defendant to prepare and pack its product shows that there was opportunity for a bone to get into the jar. No inspection was made of the dehydrated vegetables, except to see that they were of the proper cost, neither was there any inspection as to the other ingredients used in the soup mix. It appears from the testimony that the defendant, engaging in the manufacture of food for human consumption, performed no inspection of its product, or of the composite product, while manufacturing the same, but relied upon its vendors. The second mixer where the chicken fat was added was a large open bowl. It was not a grinder and would not grind up something hard, such as a small bone, which could go through the mixer and come out in its original shape. The containers were open while in the process of being filled and carried from department to department on trays by hand until all of the ingredients had been added. These ingredients were handled in the open and the final mixture, including the chicken fat, mixed in an open mixer without any provision for grinding up or removing foreign objects which could have been contained in any of the original containers or ingredients. There was no attempt made to strain the powdered product. The chicken fat when boiled was strained or sieved by the Polo Products Company. There is no evidence as to the type of strainer or sieve used by them, or the manner as to the handling of the chicken fat from the time it was poured into the cans until it was received by defendant. Defendant states there was no possibility of any bone getting into the chicken fat or oil, that it was delivered in sealed cans, and inspected, approved and stamped by a government inspector. The fact that the oil was government inspected was proper evidence for the consideration of the jury on the question of negligence. However, it is well established that government inspection is not a substitute for due care. In our opinion there was

sufficient evidence to warrant the jury in finding that plaintiff proved defendant was negligent in the manufacture, preparation and inspection of its product.

Defendant insists that the doctrine of *res ipsa loquitur* is not applicable. In *Bollenbach v. Bloomenthal*, 341 Ill. 539, our Supreme Court said (542):

"The doctrine of *res ipsa loquitur* is, that whenever a thing which produced an injury is shown to have been under the control and management of the defendant and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford *prima facie* evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. The presumption or inference of negligence raised by the application of this doctrine is not absolute or conclusive but is rebuttable, and vanishes entirely when any evidence appears to the contrary. As is said by this court in *Coal Creek Drainage District v. Sanitary District*, 336 Ill. 11: 'A presumption is not evidence and cannot be treated as evidence. It cannot be weighed in the scale against evidence. Presumptions are never indulged in against established facts. They are indulged in only to supply the place of facts. As soon as evidence is produced which is contrary to the presumption which arose before the contrary proof was offered the presumption vanishes entirely'."

Defendant states that the doctrine cannot be invoked because the instrumentality allegedly causing the injury had passed from its control to that of plaintiff, and because defendant's evidence rebutted any presumption or inference of negligence in its manufacture. In support of its contention plaintiff cites *Rost v. Kee & Chapell Dairy Co.*, 216 Ill. App. 497, 504; *Welter v. Bowman Dairy Co.*, 318 Ill. App. 305, 359; *Davis v. Van Camp Packing Co.*, 189 Iowa 775, 786.

Defendant replies that in the *Rost* case plaintiff was injured by bits of broken glass when she poured milk out of a bottle into a cup and drank it; that the broken glass was found in the bottle and plaintiff did nothing to the milk except to pour it out of the bottle; that in the *Welter* case the evidence was undisputed that the bottle of milk contained paint; and that in the *Davis* case a can of pork and beans was emptied into a bowl, nothing being mixed with them, and the illness was caused by ptomaine poisoning by eating the pork and beans. We are satisfied that under the factual situation the doctrine of *res ipsa loquitur* is applicable. The court properly overruled the motions of defendant for a directed verdict and for judgment notwithstanding the verdict.

Finally, defendant urges that the verdict is against the manifest weight of the evidence. We are unable to agree with this contention. The evidence fully justifies the verdict. The judgment of the superior court of Cook county is affirmed.

*Judgment Affirmed.*

HEBEL, P. J., and KILEY, J., concur.