CARRIE BROWN, Administratrix, Appellant, v. J. F. NEBIKER et al., Appellees.

No. 45378.

February 18, 1941.

Kenneth H. Davenport and Healey & Reynolds, for appellees.

Ed Fackler, Jr., Thomas E. Mullin, O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellant.

MITCHELL, J.—The plaintiff as administratrix of the estate of Robert E. Brown, deceased, commenced this action against the defendants, the Iowana Hotel Company of Creston, Iowa, a corporation engaged in the hotel and restaurant business, and J. F. Nebiker, the operator and manager of said hotel, as co-defendant.

The petition alleges that on the 20th of April, 1939, the plaintiff's decedent became a guest at the restaurant of the defendants and was there served with food, including a pork chop, and the decedent ate such food, including said pork chop, as prepared and served to him by the defendants. That the pork chop contained a sharp sliver of bone, not apparent to or discernible by the decedent. That the decedent ate a part of the pork chop and a sliver of bone concealed in the meat became

lodged in his throat and tore a hole in the walls of the esophagus and the injury set up an infection which caused his death on the 23d of April, 1939. That this action is at law to recover damages from the defendants, on account of serving the decedent the pork chop with the sliver of bone concealed therein.

That the substituted petition is in two counts. Count No. 1 is based upon an allegation of general negligence and carelessness, under the rule of res ipsa loquitur, and count No. 2 is based on the theory of an implied warranty on the part of the defendants that the food contained nothing injurious to the lives and health of any of its patrons, and that there was a breach of such implied warranty, and that the defendants are liable for the injury and damage done to the decedent's estate.

The defendants filed a general denial and made no other defenses.

At the end of the plaintiff's evidence the defendants made motions to withdraw counts Nos. 1 and 2 of plaintiff's substituted petition and also filed a joint motion for a directed verdict and all of these motions were sustained by the trial court, a verdict was then returned by the jury, and judgment was rendered against the plaintiff dismissing her substituted petition and cause of action and rendering judgment against her for the costs of this action. The district court having jurisdiction of the settlement of the estate of the decedent made an order authorizing and permitting this appeal and plaintiff did in due time appeal from the judgment so rendered by the district court.

Robert E. Brown was a long-time resident and citizen of Prescott, Adams county, Iowa, and prior to the 20th of April, 1939, was a local salesman for the De Kalb Agricultural Association, which was engaged in the sale of De Kalb hybrid seed corn. Floyd D. Young of Lenox, Iowa, was a supervisor for this association and was the immediate superior of the decedent. Mr. Young had other salesmen under him and he had been having evening meetings of the salesmen at the Iowana Hotel dining room in Creston and other places in his territory. Mr. Young notified his salesmen, including the decedent, that a meeting would be held in the Iowana Hotel dining room at 6:30 on April

20, 1939. There were probably a dozen other local salesmen who attended this dinner and it was held in what is called the "Blue Room", which is north of the manager's desk in the appellee's hotel in Creston, Iowa. The meal was ordered by Mr. Young and paid for by the De Kalb Agricultural Association and served by the defendants. Mr. Young arranged with Mr. Nebiker for this meal and Mr. Young told him that he wanted pork chops served. Decedent had nothing to do with ordering this meal. The meal, meat and everything else that was furnished was selected, prepared, cooked and served by the appellee and the help used was the help of the appellee. The appellee had the exclusive control of selecting and preparing the foods served. The price paid was sixty-five cents per plate. The table was in the form of a letter "U". The decedent came to the hotel from his home at Prescott and was in good health. At the table he sat facing the west. He had been to a number of these dinners prior to that time. The pork chop served was breaded or covered with some coating. The witnesses differ in regard to the kind of a coating. About two months prior to the 20th of April, 1939, the decedent had his teeth extracted and on this date was sixty years of age. The appellees served to the decedent a meal, including one of these pork chops. Very soon after the decedent began to eat he got up, said he had a bone in his throat, and left the room. He coughed and tried to get it dislodged but was unable to do so. Soon after this he and Mr. Hammer, another salesman, went to the office of Dr. Barber but the doctor was unable to remove the bone. He was then sent to a Dr. Sampson and X-ray pictures were taken and some foreign substance was discovered lodged in the esophagus. Dr. Sampson was not able to remove this substance and the decedent was advised to go to a specialist in Des Moines. Early the next morning Mr. Young took the decedent to a Dr. James A. Downing, Bankers Trust Building, Des Moines, Iowa, and Dr. Downing examined the decedent and advised him to go to the Methodist Hospital and there submit to an operation. The decedent at once went to the hospital and the operation was performed about 11:30 in the forenoon of April 21, 1939. The operation consisted of inserting a laryngospeculum, which is a tube twenty-

five centimeters long, with a light in the pistol, and attached to a dry cell for illumination, so that the esophagus could be opened and looked into through the lumen of the tube. When the cricoid cartilage was lifted the upper end of the esophagus was swollen. It was discolored from dark red to blue. As the esophagus was opened some material was seen just ahead of the speculum and an attempt was made to grasp it with the forceps but it slid down ahead of the speculum, evidently being held by the muscle spasm, and as soon as the speculum released the muscle spasm, the foreign body slid on down the esophagus. Dr. Downing, with the aid of the speculum, got hold of the foreign substance and removed a small piece of meat. It was about the size of a small bean. Dr. Downing discovered, on the right posterior wall of the esophagus just below the upper opening, a tear in the wall of the esophagus. The doctor said he could not give the exact size of the tear but it might have been from an eighth of an inch to a quarter of an inch long. It was apparently a ragged hole. It went through the esophagus wall. After the speculum was pushed down the esophagus the doctor again saw this foreign material as it got to the opening of the stomach, but it passed into the stomach so quickly he was unable to get hold of it with the forceps and extract it. The doctor said it had the appearance of a piece of meat. The doctor testified that he had never heard of meat being cooked so hard that it would tear the wall of the esophagus, and it was his judgment that to make such a hole in the esophagus would require a sharp piece of material like a sharp piece of bone, or something of that kind. It would have to be hard material to tear a hole in the esophageal wall. The doctor also testified that the injury he found could have been caused by a sharp piece of bone. This operation was performed on Friday, April 21, 1939. The infection that was caused by reason of the tear in the esophagus progressed rapidly and Robert E. Brown died on Sunday, April 23, 1939, at approximately seven o'clock in the evening.

The evidence in this case showed that several people who attended the dinner found bone in their pork chops. The appellant offered as evidence the testimony of five people who attended the dinner given by Mr. Young at the Iowana Hotel on

the evening of April 20, 1939. They all testified that they found bones in the pork chops which they ate. They were of various sizes and shapes. One was described as being the size of a tooth pick, or probably a little longer. None of these witnesses, nor any of the other guests that night suffered any harm from the bones that they testified were in the pork chops, with the exception of Mr. Brown who had no teeth, either natural or false.

One of the errors complained of is that the lower court refused to permit the appellant to offer the evidence of more than five witnesses, who attended the dinner, to testify that they found bones in the pork chops which they ate. The appellant offered to prove by three other witnesses who attended the dinner that they found bones of various sizes and shapes in the pork chops which were served them. The court refused to permit these witnesses to testify on the grounds that in the third judicial district, where this case was tried, there is a rule that limits parties to five witnesses on a collateral issue. We do not find it necessary to pass upon this question. The evidence offered was only cumulative and the court had already permitted five witnesses to testify on this question. Under appellant's theory, if there had been five hundred at the dinner, each should have been permitted to appear as a witness. This case is here on an appeal from a ruling on a motion for a directed verdict and it makes no difference whether five witnesses or eight witnesses testified on the same proposition.

There are many interesting questions argued. We do not find it necessary to pass upon them; we feel that the lower court was right in sustaining the motion because "there was no sufficient evidence in the record to support a finding by the jury that the pork chop served to plaintiff's intestate contained any foreign substances".

Appellant relies almost entirely on the cases of Davis v. Van Camp Co., 189 Iowa 775, 800, 176 N. W. 382, 392, 17 A. L. R. 649, and Anderson v. Tyler, 223 Iowa 1033, 274 N. W. 48.

In the Van Camp case, this court said:

"We make a distinction between food products which are canned, bottled, or wrapped in such a way that the contents and the condition thereof may not be known to the purchaser

until opened for use by the consumer, and products which are not so put up, and the condition of which is observable.''

. In the Van Camp case, there was evidence that the pork and beans poisoned the unfortunate people who ate them. In the Anderson case a mouse was found in the bottle of the soft drink, and that as a result Anderson was poisoned. In the case at bar there is no claim made that decedent was poisoned, or that there was anything the matter with the pork chop that he tried to eat, other than that he swallowed a bone, which was in the pork chop.

There are a number of cases where different kinds of material have been found in food which without question were things entirely foreign to the food, such as glass, wire, nails and things of that nature, but these cases are far from holding that a small piece or sliver of a bone in a pork chop is a foreign substance to the pork chop.

One of appellant's witnesses was a chef, who described in detail the manner of preparing and serving a pork chop, but he admitted that the bone is part of the pork chop, that all pork chops served are not entirely free from loose bones, and that all that are served are not entirely free from the chine bone. Appellant cites us no case to sustain her contention, and we have found none.

The California supreme court recently was confronted with a very similar case to the one at bar. There a person entered a restaurant and purchased and paid for an article of food known as a chicken pie. The petition alleged that the chicken pie served contained ''a dangerous, harmful and injurious subject, to-wit, a sharp and pointed fragment and/or sliver of chicken bone, which might be and was highly injurious to anyone eating said chicken pie''. We quote from the case of Mix v. Ingersoll Candy Co., 6 Cal. 2d 674, 681, 59 P. 2d 144, 147:

''We will first discuss the question of whether or not the facts pleaded in the first count were sufficient to support a judgment based upon an implied warranty. Bearing in mind the exact wording of section 1735 of the Civil Code whereby the implied warranty is imposed upon a restaurant keeper, is there an obligation imposed by the statute upon a restaurant keeper to

furnish perfect food to his patrons at all hazards; that is to say, is his obligation that of an absolute insurer of his food? The answer, in our opinion, must be in the negative.

"The words of the Code section are that the food furnished by the restaurant keeper shall be 'reasonably' fit for such purpose—human consumption. It may well happen in many cases that the slightest deviation from perfection may result in the failure of the food to be reasonably fit for human consumption.

"On the other hand, we are of the opinion, that in certain instances a deviation from perfection, particularly if it is of such a nature as in common knowledge could be reasonably anticipated and guarded against by the consumer, may not be such a defect as to result in the food being not reasonably fit for human consumption.

"The facts presented in the instant case we think present such a situation. We have examined a great many cases dealing with the question of the liability of restaurant keepers which arose out of the serving of food which was held to be unfit for human consumption, and we have failed to find a single case in which the facts are similar to the instant case, or in which a court has extended the liability based upon an implied warranty of a restaurant keeper to cover the presence in food of bones which are natural to the type of meat served.

"All of the cases are instances in which the food was found not to be reasonably fit for human consumption, either by reason of the presence of a foreign substance, or an impure and noxious condition of the food itself, such as for example, glass, stone, wires or nails in the food served, or tainted, decayed, diseased or infected meats or vegetables.

"Although it may frequently be a question for a jury as the trier of facts to determine whether or not the particular defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute.

"It is insisted that the court may so determine herein only if it is empowered to take judicial notice of the alleged fact that chicken pies usually contain chicken bones. It is not necessary to

go so far as to hold that chicken pies usually contain chicken bones. It is sufficient if it may be said that as a matter of common knowledge chicken pies occasionally contain chicken bones.

"We have no hesitancy in so holding, and we are of the opinion that despite the fact that a chicken bone may occasionally be encountered in a chicken pie, such chicken pie, in the absence of some further defect, is reasonably fit for human consumption. Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones.

"At least he cannot hold the restaurant keeper whose representations implied by law is that the meat dish is reasonably fit for human consumption, liable for any injury occurring as a result of the presence of a chicken bone in such chicken pie.

"In the case of Goetten v. Owl Drug Company, 59 P. (2d) 142, this day decided, we held that the application of the rule of implied warranty might impose a heavy burden upon the keeper of restaurants and lunch counters, but that considerations of public policy and public health and safety are of such importance as to demand that such obligation be imposed. This is true, but we do not believe that the onerous rule should be carried to absurd limits. Certainly no liability would attach to a restaurant keeper for the serving of a T-bone steak, or a beef stew, which contained a bone natural to the type of meat served, or if a fish dish should contain a fish bone, or if a cherry pie should contain a cherry stone—although it be admitted that an ideal cherry pie would be stoneless. The case of a chicken bone in a chicken pie is, in our opinion, analogous to the cited examples, and the facts set forth in the first count of the complaint do not state a cause of action.

"With reference to the count based upon negligence, the same logic and reasoning applies. The facts pleaded do not establish a lack of due care on the part of the restaurant keeper.

"We do not believe it is a question of contributory negligence on the part of the customer, but a question of whether or not a restaurant keeper in the exercise of due care is required to serve in every instance a perfect chicken pie, in that all bones are entirely eliminated.

"If the customer has no right to expect such a perfect product, and we think he is not so entitled, then it cannot be said that it was negligence on the part of the restaurant keeper to fail to furnish an entirely boneless chicken pie. The facts set forth in the second count do not, therefore, state a cause of action.

"The logic of our decision with reference to both counts of the complaint leads to an affirmance of the trial court in sustaining the demurrer to both counts of the complaint and the entry of judgment in favor of the defendants."

■ The applicable part of section 1735 of the Civil Code of California is the standard provision of the Uniform Sales Act and is the exact language used in section 9944 [§15] of the 1939 Code of Iowa, under chapter 435, Sales Law.

We quote also from Silva v. Woolworth Company, 28 Cal. App. 2d 650, 83 P. 2d 76:

"The facts are undisputed; the only question involved is whether as a matter of law they constitute a breach of warranty, or negligence. Plaintiff ordered a 'special plate' of roast turkey with dressing and vegetables. When it was served to her, she removed the one slice of turkey and ate some of the dressing. She choked, or gagged, and with the aid of a bystander, emitted a small bone about three-quarters of an inch long, one-quarter of an inch wide and one-eighth of an inch thick. This was carefully preserved, measured, and photographed, and placed in evidence at the trial.

"Plaintiff suffered a sore throat and some embarrassment from her experience. Medical fees of $36 were included in the judgment.

"Appellant relies upon Mix v. Ingersoll Candy Co., 6 Cal. 2d 674, 59 P. 2d 144, in support of its argument that the case must fall upon both grounds. That case is controlling, and hence the judgment must be reversed.

"The criterion upon which liability is determined in such cases is whether the object causing the injury is 'foreign' to the dish served. It was there said that [page 148]: 'Bones which are natural to the type of meat served cannot legitimately be

called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones.' The direct holding was that a chicken bone was not a foreign substance to a chicken pie just as a beef bone found in a steak or beef stew or a fish bone found in a fish dish does not render the food unfit for human consumption.

"Here the turkey and the dressing were served together in one section of the plate. The plaintiff pushed the meat aside so that she could eat the dressing first. Whether the bone came to the plate by way of the meat or the dressing is a pure conjecture upon which there was no evidence. From the exhibit found in the record, it would appear that it had been chipped off when the turkey was carved.

"The only evidence relating to the preparation of the dressing discloses the improbability of its having entered the dressing at that time. But we must look upon the service as one dish as delivered, in which there was no substance not 'natural to the type of meat served.'

"The Mix case also disposes of the question of negligence in the preparation of the food. The finding that the defendant was negligent is based solely on the evidence that the bone was found in the dressing. If this would support an inference of negligence, there is nothing left of the rule in the Mix Case, which was based on the pleading alone."

In the Silva case, it will be noted that, while the turkey and dressing were served on the same plate, the plaintiff pushed the meat aside, and it was while eating the dressing that the bone was swallowed. Yet the California court held there was no liability as it appeared that the bone had been chipped off when the turkey was carved.

In the Mix case, supra, the court called attention to the fact that it had failed to find a court which "has extended the liability based upon an implied warranty of a restaurant keeper to cover the presence in food of bones which are natural to the type of meat served".

In the case at bar, the meat served was pork chops. There are bones in all pork chops. If a sliver of bone is not a foreign substance in a chicken pie, or a turkey bone in turkey dressing,

certainly small bones in a pork chop are not a foreign substance to the pork chop.

One who eats pork chops, or the favorite dish of spareribs and sauerkraut, or the type of meat that bones are natural to, ought to anticipate and be on his guard against the presence of bones, which he knows will be there. The lower court was right in directing the verdict, and it necessarily follows that this case must be and it is affirmed.—Affirmed.

HALE, C. J., and SAGER, BLISS, WENNERSTRUM, OLIVER, and MILLER, JJ., concur.