C. ROBERT ADAMS v. THE GREAT ATLANTIC & PACIFIC TEA CO.

(Filed 14 January, 1960.)

**1. Food § 2—**

A retail merchant who sells food in a sealed package to a customer impliedly warrants that the food is fit for human consumption.

**2. Same—**

Even though there is no direct evidence of the composition of the cereal purchased by plaintiff, which he alleged breached the seller's implied warranty of fitness for human consumption, plaintiff's introduction in evidence of the container designating the product as corn flakes and his testimony that he and his family had eaten corn flakes from this package, is sufficient to show that the product was manufactured from corn.

**3. Same—**

In an action for breach of implied warranty by the retailer that the corn flakes sold in a sealed container were fit for human consumption, nonsuit is properly entered upon plaintiff's evidence disclosing that he was injured while eating the cereal by breaking a tooth when he bit down on a part of a grain of corn which had crystalized into a state as hard as quartz, since such particle is not a foreign substance but is a natural part of the original food not removed in processing, and its presence might have been anticipated by the consumer, there being no evidence that the corn flakes themselves were decayed or spoiled or unwholesome.

APPEAL by plaintiff from *Sharp, S. J.,* 31 August 1959 Civil Term, of GUILFORD (Greensboro Division).

Action for damages for the loss of a tooth allegedly caused by the breach of an implied warranty that a box of Kellogg's Corn Flakes in the original sealed container sold by defendant to plaintiff was wholesome and fit for human consumption.

From a judgment of nonsuit entered at the close of plaintiff's evidence, plaintiff appeals.

*Rollins and Rollins for plaintiff, appellant.*

*McLendon, Brim, Holderness & Brooks by L. P. McLendon, Jr., and C. T. Leonard, Jr., for defendant, appellee.*

PARKER, J. On 10 November 1958, plaintiff bought from one of defendant's stores a box of Kellogg's Corn Flakes in a sealed package. On the morning of 14 November 1958, while eating in his home a bowl of corn flakes taken from this package, he bit down on something very hard, breaking off part of an eyetooth. The breaking of the tooth exposed a nerve. causing him considerable pain. The same morning he had the rest of the tooth extracted.

When he bit on this object, he spit it out, examined it, and found

that it was a little brown, hard, crystal-like object. A chemical analysis of this object showed that it was part of a grain of corn that had partially been crystalized. It had been reduced from its normal state of a grain of corn to a state as hard as a piece of quartz. He had never seen any particle of this size in corn flakes before.

Plaintiff testified on cross-examination: "The balance of the box of corn flakes remained in my home after the accident and it was consumed by my family. . . My sole contention is that this particle of corn is a deleterious or unwholesome substance that was contained in the corn flakes. . . . I and my family eat hamburger meat, fish and chicken, things of that nature. I have on occasion bitten into a cherry pit or seed pit in eating cherry preserves, or something of that sort."

We held in *Rabb v. Covington,* 215 N.C. 572, 2 S.E. 2d 705, that when a retail merchant sells food in a sealed package to a customer there is an implied warranty of fitness for human consumption. In this case the "wieners" or sausages sold were in a casing, which plaintiff conceded constituted a sealed container, and had in them pieces of metal. Upon authority of *Rabb v. Covington,* a nonsuit was held improper in *Williams v. Elson,* 218 N.C. 157, 10 S.E. 2d 668, where defendant sold plaintiff for consumption a barbecued beef sandwich containing glass. In *Davis v. Radford,* 233 N.C. 283, 63 S.E. 2d 822, plaintiff sued Radford, a retail druggist, for breach of an implied warranty of wholesomeness in the sale to his intestate of an article for human consumption known as "Westsal," a salt substitute, which he alleged contained poisonous ingredients. In this case the Court recognized as applicable the doctrine of implied warranty.

Defendant in its brief states: "Defendant does not question the existence of an implied warranty that the corn flakes sold were fit for human consumption but urges that 'the warranty must be reasonably construed in the light of common knowledge in reference to the nature of the article sold.' *Cavanagh v. Woolworth Co.,* 308 Mass. 423, 32 N.E. 2d 256."

In the *Cavanagh* case the article sold was a rubber stopper to be used in bottles containing gas charged or carbonated beverages. The Court held that the seller did not, by virtue of statutory implied warranty of fitness for intended use, become an insurer that the stopper could be used with absolute safety, and stopper was not required to be perfectly adapted for its intended use but only reasonably fit therefor.

Plaintiff's case is based upon the presence in the corn flakes he was eating of part of a grain of corn that had partially been crystalized, and thereby reduced from its normal state of a grain of corn to a state as hard as quartz, that is the presence of a substance na-

tural to the corn flakes, and not removed therefrom in the process of its preparation for human consumption, and he contends that this constituted a breach of defendant's implied warranty of reasonable fitness of the corn flakes for human consumption. His is not a case of a foreign object, like glass, a piece of metal, etc., in the corn flakes, or of the corn flakes being decayed, diseased, or in a spoiled and poisonous condition.

Defendant contends that its implied warranty only extends to cases where foreign matter is contained in the food, or where the food is diseased, decayed, or otherwise in a spoiled or poisonous condition, and does not extend to the facts here.

Plaintiff states in his brief "there was no evidence presented on the composition of the cereal." However, plaintiff introduced in evidence the package bearing the label "Kellogg's Corn Flakes," which he bought from defendant. Webster's New International Dictionary, 2nd Ed., gives this definition of cereal: "2. A prepared foodstuff of grain, as oatmeal or flaked corn, used especially with milk or cream as a breakfast food." In our opinion, plaintiff's evidence shows these corn flakes were made from corn.

36 C.J.S., pp. 1247-8, defines foreign substance: "A substance occurring in any part of the body or organism where it is not normally found, usually introduced from without." A sliver of bone in a pork chop was held not a foreign substance to a pork chop in *Brown v. Nebiker*, 229 Iowa 1223, 296 N.W. 366.

In *Mix v. Ingersoll Candy Co.*, 6 Cal. 2d 674, 59 P. 2d 144, plaintiff was injured by swallowing a fragment of chicken bone, while eating a chicken pie at a restaurant. The Supreme Court sitting in bank, while agreeing that there was an implied warranty of fitness on such a sale by a restaurateur by virtue of their Uniform Sales Act, held that such a warranty was not breached by the presence of the bone in the chicken pie. The Court said: "Bearing in mind the exact wording of section 1735 of the Civil Code whereby the implied warranty is imposed upon a restaurant keeper, is there an obligation imposed by the statute upon a restaurant keeper to furnish perfect food to his patrons at all hazards; that is to say, is his obligation that of an absolute insurer of his food? The answer, in our opinion, must be in the negative. The words of the Code section are that the food furnished by the restaurant keeper shall be 'reasonably' fit for such purpose—human consumption. It may well happen in many cases that the slightest deviation from perfection may result in the failure of the food to be reasonably fit for human consumption. On the other hand, we are of the opinion, that in certain instances a deviation from perfection, particularly if it is of such a nature as in common knowledge could

be reasonably anticipated and guarded against by the consumer, may not be such a defect as to result in the food being not reasonably fit for human consumption. The facts presented in the instant case we think present such a situation. We have examined a great many cases dealing with the question of the liability of restaurant keepers which arose out of the serving of food which was held to be unfit for human consumption, and we have failed to find a single case in which the facts are similar to the instant case, or in which a court has extended the liability based upon an implied warranty of a restaurant keeper to cover the presence in food of bones which are natural to the type of meat served. All of the cases are instances in which the food was found not to be reasonably fit for human consumption, either by reason of the presence of a foreign substance, or an impure and noxious condition of the food itself, such as for example, glass, stones, wires or nails in the food served, or tainted, decayed, diseased, or infected meats or vegetables. Although it may frequently be a question for a jury as the trier of facts to determine whether or not the particular defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute. It is insisted that the court may so determine herein only if it is empowered to take judicial notice of the alleged fact that chicken pies usually contain chicken bones. It is not necessary to go so far as to hold that chicken pies usually contain chicken bones. It is sufficient if it may be said that as a matter of common knowledge chicken pies occasionally contain chicken bones. We have no hesitancy in so holding, and we are of the opinion that despite the fact that a chicken bone may occasionally be encountered in a chicken pie, such chicken pie, in the absence of some further defect, is reasonably fit for human consumption. Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones. At least he cannot hold the restaurant keeper whose representation implied by law is that the meat dish is reasonably fit for human consumption, liable for any injury occurring as a result of the presence of a chicken bone in such chicken pie. In the case of *Goetten v. Owl Drug Company,* 59 P. (2d) 142, this day decided, we held that the application of the rule of implied warranty might impose a heavy burden upon the keeper of restaurants and lunch counters, but that considerations of public policy and public health and safety are of such importance as to demand that such obligation be imposed. This is true, but we do not believe that the onerous rule should be carried to absurd limits. Cer-

tainly no liability would attach to a restaurant keeper for the serving of a T-bone steak, or a beef stew, which contained a bone natural to the type of meat served, or if a fish dish should contain a fish bone, of if a cherry pie should contain a cherry stone—although it be admitted that an ideal cherry pie would be stoneless. The case of a chicken bone in a chicken pie is, in our opinion, analogous to the cited examples, and the facts set forth in the first count of the complaint do not state a cause of action."

The holding of the Supreme Court in the *Mix* case was held controlling in *Silva v. F. W. Woolworth Co.*, 28 Cal. App. 2d 649, 83 P. 2d 76, where the keeper of a restaurant was held not liable on the theory either of implied warranty or of negligence for injuries alleged to have been sustained by a customer from choking on a fragment of turkey bone in a serving of roast turkey with dressing. The Court said: "The criterion upon which liability is determined in such cases is whether the object causing the injury is 'foreign' to the dish served."

The holding in the *Mix* case was held controlling in *Lamb v. Hill*, 112 Cal. App. 2d 41, 245 P. 2d 316, where the Court held that a cafe owner was not liable on grounds of negligence, for injuries sustained by a customer as a result of swallowing a fragment of chicken bone contained in a chicken pie, purchased by customer, since the facts do not establish a lack of due care on the defendant's part and customer was not entitled to expect an entirely boneless chicken pie in every instance.

*Shapiro v. Hotel Statler Corporation*, (U. S. District Court S. D. California, Central Division, 1955), 132 F. Supp. 891, was an action against a restaurant keeper for damages by a customer, who, while eating a dish of Hot Barquette of Seafood Mornay, made of several different kinds of fish, swallowed a fish bone, which lodged in his throat. The Court held that bones which are natural to type of fish served are not a "foreign substance," and a customer who eats such food ought to anticipate and guard against the presence of such bones, and following the *Mix* case, *supra*, the restaurant keeper was not, under the implied warranty imposed by California law, liable for damages resulting from presence of the fish bone.

*Goodwin v. Country Club of Peoria*, 323 Ill. App. 1, 54 N.E. 2d 612, was an action for wrongful death caused by swallowing a bone which lodged in plaintiff's intestate's throat, while eating creamed chicken. The Court held that the presence in creamed chicken, prepared from diced turkey, of a bone which lodged in diner's esophagus, and caused death was not a breach of implied warranty that food served was wholesome and fit for human consumption. The Court in a scholarly

opinion discusses the *Mix* case, *supra,* the *Silva* case, *supra,* and *Brown v. Nebiker,* 229 Iowa 1223, 296 N.W. 366.

In *Brown v. Nebiker,* plaintiff's intestate, while eating a pork chop at a restaurant, swallowed a sliver of bone contained in the meat, which punctured his esophagus and caused his death. Plaintiff's substituted petition had two counts: one, based upon negligence under the rule of *res ipsa loquitur,* and the other, based on implied warranty that the food contained nothing injurious to health and life. The trial court directed a verdict for the defendant. The action was affirmed by the Supreme Court, on the ground that there was no evidence that the pork chop contained any "foreign substance," since a sliver of bone natural to the meat being served was not a "foreign substance" to the pork chop. The Court discussed, and quoted at length from the *Mix* case. The Court said: "One who eats pork chops, or the favorite dish of spareribs and sauerkraut, or the type of meat that bones are natural to, ought to anticipate and be on his guard against the presence of bones, which he knows will be there. The lower court was right in directing the verdict, and it necessarily follows that this case must be and it is affirmed."

In *Courter v. Dilbert Bros., Inc.,* 186 N.Y.S. 2d 334, plaintiff purchased a jar of prune butter containing a small piece of broken prune pit, and was injured by this piece of prune pit. A dissenting opinion says she fractured a tooth, and injured her gum. Plaintiff claimed the piece of prune pit was a "foreign substance," and that defendants breached the warranty in that the prune butter with a "foreign substance" therein was not fit for human consumption. The Court said: "The alleged injurious substance is in fact not a foreign substance and, consequently, cannot be the basis of an action for injuries by reason of the presence of the foreign substance." The second headnote reads: "Piece of prune pit allegedly contained in jar of prune butter was not a 'foreign substance,' and consequently could not be basis for action for damage resulting from foreign substance, but even if it were, in absence of privity between retailer and producer of jar of prune butter containing piece of pit, retailer, which was held liable to consumer who was allegedly injured by pit, could not recover from producer, either for negligence or for breach of warranty." The Court discusses and quotes from *Brown v. Nibiker, supra,* the *Mix* case, *supra, Silva v. F. W. Woolworth, supra.*

Plaintiff relies on *Bonenberger v. Pittsburgh Mercantile Co.,* 345 Pa. 559, 28 A. 2d 913, 143 A.L.R. 1417, which he contends is a case in point. The facts are: Plaintiff, a housewife, ordered a sealed can of oysters from defendant, a grocer, for delivery the next day. When she received the oysters, she emptied the can into a can of milk in

order to prepare a stew. Thereafter in tasting the stew for seasoning, she swallowed a sharp oyster shell about the size of a quarter. The shell lodged in her esophagus, necessitating an operation for its removal. She and her husband brought this action in *assumsit,* averring breach of warranty, under Section 15 of the Sales Act. A majority of the Court held that under Section 15(1) of the Sales Act there was an implied warranty that the oysters were reasonably fit for human consumption. The Court then said: "We cannot say as a matter of law that the product furnished the plaintiffs was reasonably fit for human consumption." In the trial court there was a directed verdict for defendant. The Court reversed the judgment and ordered a *venire facias de novo.* Two judges dissented. The dissenting opinion states, in part: "No authority has been cited by the majority for extending the liability upon an implied warranty to a case like the present, nor have I been able to find any; and I cannot believe the Act contemplates it should be so extended." The dissenting opinion then cites the *Mix* case, *supra,* and the *Silva* case, *supra,* and quotes extensively from the *Mix* case.

The Temple University Law Quarterly, Volume XVII (1942-1943) p. 204, has this to say as to the *Bonenberger* case: "Here the injury was caused not by a foreign substance, but by an inherent part of the oyster—its shell. A reasonable consumer should expect such shells in oysters. The line of cases the court should have followed is pointed out in the dissenting opinion. They were cases where: a chicken bone was found in a chicken pie, a turkey bone in a serving of roast turkey. The majority opinion realized that it makes a difference whether the article causing harm is an inherent part of the article or not, but claimed that it was for the jury to decide whether the oysters were reasonably fit for human consumption. It is submitted that the court should have followed what seems to be the more practical rule laid down in the *Ingersoll* case *(Mix v. Ingersoll Candy Co., supra,)*: Although the question of fitness is usually for the jury, it may sometimes be that, 'The court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute. It is sufficient if it may be said that as a matter of common knowledge chicken pies occasionally contain chicken bones.' Isn't it just as common for a can of oysters to contain a shell? No case has been found, in Pennsylvania or elsewhere, holding that because an article has retained a portion of itself that was intended to be extracted (as the oyster shell here), the product has thereby been rendered unwholesome and unfit for human consumption. Only when the courts have found extraneous, foreign matter to be present have they held defendant liable for breach of warranty, in either tort or trespass. Of course, it is different in

cases of rancid or spoiled food. For instance, liability was imposed for: wire in a hot dog, metal in sausage, broken glass in jelly, ground glass in Coca-Cola, a rat in an ice cream cone, a centipede in soup, a rat in tea, a screw in coffee. It is suggested that the court has, in this case, extended the protection of the warranty further than was intended by the Sales Act. This may be due to the absence of a clear and succinct definition of 'unwholesome' and 'fit for human consumption.' Be that as it may, it is submitted that liability under an implied warranty should be limited to those cases where a foreign substance — a substance the presence of which is not foreseeable — causes the harm."

Following the report of the *Bonenberger* case in 143 A.L.R., there is, beginning on p. 1421, an interesting annotation entitled. "Implied warranty of reasonable fitness of food for human consumption as breached by substance natural to the original product and not removed in processing." Other annotations of interest will be found in 4 A.L.R. 1560; 35 A.L.R. 921; 47 A.L.R. 150; 104 A.L.R. 1033; 105 A.L.R. 1042; 168 A.L.R. 1056-7; 171 A.L.R. 1209; 7 A.L.R. 2d 1027, particularly 1053-4.

After a study of the *Bonenberger* case, we are of opinion it is not, so far as a diligent search on our part has shown, in line with the better reasoned cases on the subject of all other Courts, who have decided the exact question and have a contrary view. The Court in *Goodwin v. Country Club of Peoria, supra,* after stating that the appellee relies upon the case of *Bonenberger v. Pittsburgh Mercantile Co., supra,* said: "After a study of that case, we do not consider it persuasive in the case at bar."

Plaintiff cites and relies on *Paolinelli v. Dainty Foods Manufacturers,* 322 Ill. App. 586, 54 N.E. 2d 759. This case is clearly distinguishable. The suit was based on the alleged negligence of the defendant in the manufacture, preparation and inspection of its product, and the jury so found.

Plaintiff cites and relies on *Gimenez v. Great Atlantic & Pacific Tea Co.,* 264 N.Y. 390, 191 N.E. 27. This case is clearly distinguishable, for it appears that the crab meat itself was deleterious, that is harmful or destructive.

Our case of *Davis v. Radford, supra,* is of no help to plaintiff, for there it is alleged the "Westsal" sold contained poisonous ingredients.

The instant case is one where the substance causing the injury is natural to the corn flakes, and not a foreign substance, and where a consumer of the product might be expected to anticipate the presence of the substance in the food. We consider Judge Sharp's judgment of

involuntary nonsuit is in line with the better reasoned cases on the subject, and with what appears to be the overwhelming majority view. The judgment below is

Affirmed.