Perry B. Goodwin, Adminstrator of Estate of Mabelle Goodwin, Deceased, Appellee, v. Country Club of Peoria, Appellant.

## Gen. No. 9,910.

Opinion filed April 27, 1944.

HUNTER, KAVANAGH & McLAUGHLIN, of Peoria, for appellant.

CASSIDY, SLOAN & CRUTCHER, of Peoria, for appellee.

MR. JUSTICE HUFFMAN delivered the opinion of the court.

1

This is an action by appellee administrator for the wrongful death of his wife, occasioned from swallowing a bone which lodged in her throat, while eating creamed chicken. The complaint consists of three counts, two based on negligence and one on breach of warranty. Trial resulted in a verdict for plaintiff. The defendant appeals from judgment rendered thereon.

Appellant is a nonprofit corporation under the statutes of this State relative to such organizations. Its activities are such as are common to a country club. The deceased was a member of the Chapter of D. A. R. at Peoria. This organization had secured permission from appellant for use of its club house for a luncheon and afternoon party to be held on June 16, 1941. The cost of the luncheon was charged directly to the chapter and it made settlement therefor, collecting from its respective members their proper charge. Creamed chicken was the meat course of the luncheon. It appears from the evidence, that although the meat course is termed creamed chicken, yet as a matter of fact, it was made from turkey, and that on occasions like this, it is usual and customary to use turkey, when possible, in preparing what is ordinarily termed creamed chicken.

Charles Jones, the cook, testified as a witness for appellee. He states that he had been a cook since 1914; that he had worked in various hotels, restaurants and clubs; that he had lived in Peoria since 1933; that he had been advised of the luncheon on the preceding day and that the meat course would be creamed chicken; that turkeys were boiled; that he deboned and diced the turkey meat; that he had prepared creamed chicken many times and that the method he used was the ordinary regular method uniformly followed by cooks; that the meat was diced into cubes of approximately one inch in size; that no one worked with him while he was deboning and dicing the meat; that the kitchen

was large and well lighted; that he took the bones from the carcass and deposited them in the garbage can; that he did not drop any of the bones into the turkey meat; that after the meat was diced, he placed it in the cooler where it was to be kept until time to be served; and that there were no bones in the vicinity of where he placed the meat in the cooler.

It appears that some six or more people were employed in the kitchen of appellant. One other employee was called as a witness by appellee. She was the wife of the cook, Mr. Jones. She states there was a larger attendance at the luncheon than had been expected; that it became necessary to prepare additional meat; and that she saw another cook deboning and dicing turkey for the additional guests.

During the course of the luncheon and while eating creamed chicken, Mrs. Goodwin swallowed a bone, which became lodged in her throat. She retired to the ladies lounge with a companion, who called Mrs. Goodwin's husband, a practicing physician. He advised this lady to bring his wife immediately to the Jefferson building. Here he met them and took Mrs. Goodwin to Dr. Sneller's office for examination and treatment. He states that Dr. Sneller gave him some powder for Mrs. Goodwin to take and directed that an ice pack be placed at her throat. She was then taken to the Proctor Hospital where Dr. Sneller saw her on the following day, June 17th. On the evening of that day, she returned home. She did not partake of solid foods but limited her diet to liquids. She was able to be up and about the house. Dr. Goodwin says she did not seem to be in a great amount of pain. This situation continued until June 20th, when Dr. Goodwin says he noticed Mrs. Goodwin was not swallowing properly, whereupon he called Dr. Sneller, who suggested that an X-ray should be taken. He says Mrs. Goodwin did not wish to have the X-ray pictures made on that day and the matter rested until the following Monday,

June 23rd, when she was taken to the Proctor Hospital for X-ray pictures. Dr. Goodwin specialized in this work, and was in charge of such work in the Proctor and St. Francis Hospitals. He gave Mrs. Goodwin barium meal to drink. It was discovered there was an obstruction in the esophagus. Following the taking of the X-ray pictures, Dr. Goodwin took Mrs. Goodwin home and reported his findings to Dr. Sneller. Subsequently, and on June 23rd, Dr. Goodwin took Mrs. Goodwin to the St. Francis Hospital. He states that her condition at this time seemed to be the same as it had been. On the following day, June 24th, Dr. Sneller inserted an esophagoscope into the esophagus for the purpose of examination and of removing the obstruction. The operation consumed about 40 minutes. The record does not disclose what the results were and Dr. Sneller did not testify. Following this operation and later in the day, Mrs. Goodwin was removed to the Proctor Hospital. On the evening of this day, Dr. Jennings made an examination of Mrs. Goodwin. He states he found her abdomen distended and that she complained of pain in the left side of the chest. She subsequently developed difficulty in breathing and a collapsed lung. Dr. Jennings states he obtained the history of her swallowing a foreign body, which lodged in the esophagus. He gives as his opinion that her death was caused from infection resulting from such foreign body. Dr. Burroughs and Dr. Boynton were called in consultation on June 28th. Mrs. Goodwin died on that day. The history they obtained in the case was the same as above detailed.

Dr. Goodwin says that in his opinion Mrs. Goodwin died from perforation of the esophagus, resulting in infection which spread into the chest cavity; that he does not know when the perforation occurred, but there was no temperature until after the operation with the esophagoscope.

Appellant urges four grounds for reversal. First, that the presence of a bone which is natural to the type

of meat served, is not a breach of the implied warranty placed by law upon a restaurant keeper that the food is wholesome and fit for human consumption; second, that there was no evidence of negligence on the part of appellant; third, that plaintiff's intestate was a licensee and not a guest; and fourth, that her death was the result of negligence in failing to provide adequate medical attention within a reasonable time.

Appellant caused to be submitted to the jury a special interrogatory as to whether the bone which plaintiff's intestate swallowed was a part of the fowl from which the food in question had been prepared. The jury answered this interrogatory in the affirmative. Appellant does not question the finding of the jury in this regard, thus the source of the bone is not in dispute.

Appellant cites the following three cases in support of its first ground for reversal: *Brown v. Nebiker*, 229 Iowa 1223, 296 N. W. 366 (1941); *Mix v. Ingersoll Candy Co.*, 6 Cal. (2d) 674, 59 P. (2d) 144 (1936); *Silva v. F. W. Woolworth Co.*, 28 Cal. App. (2d) 649, 83 P. (2d) 76 (1938).

The case of *Brown v. Nebiker* was a suit to recover damages for death due to a sliver of bone from a pork chop, which lodged in the deceased's throat, punctured the esophagus, from the effects of which he died. The deceased was a salesman and attending a dinner of fellow salesmen on the evening of April 20th. The meat served was pork chops. While eating this meat, a sliver of bone became lodged in his throat. On the morning of April 21st, the attending physician inserted an esophagoscope in the throat of the deceased. In attempting to remove the sliver of bone it was pushed down into the opening of the stomach. The doctor at this time noticed a tear in the esophagus. This man died two days later. The trial court in that case directed a verdict for the defendant. This action was affirmed by the Supreme Court, on the ground that there was no evidence the pork chop contained any for-

eign substance. It was there held that bones which were natural to the type of meat being served, were not to be considered as foreign substance or such as to render the food in question unwholesome and unfit for human consumption. The court observed that common experience of life dictates that one eating meats from animals, fowl, or fish, should do so with a knowledge that such food might contain pieces of bone peculiar to the type of meat being eaten, and that such were not to be considered foreign to the food being served, nor could it be said such bones rendered the food unfit for human consumption. The conclusion of the court was that one eating meat dishes, to which bones are natural, should do so with a due regard to such condition. The court discusses and quotes at length from the case of *Mix v. Ingersoll Candy Co., supra.* That action grew out of injuries received by the plaintiff from a chicken bone lodging in his throat while eating chicken pie at a restaurant. Two years subsequent to the *Mix* case, a second case of a similar character arose (*Silva v. Woolworth Co., supra*) which had to do with the plaintiff being injured by a fragment of turkey bone contained in roast turkey and dressing. That case followed the rule announced in the *Mix* case, the court holding that the criterion upon which liability was to be determined was whether the object causing the injury was foreign to the dish served. It then commented on the fact that bones in meat, fowl and fish were natural to such food and could not be considered as foreign thereto or as rendering the same unfit for human consumption.

Appellee relies upon the case of *Bonenberger v. Pittsburg Mercantile Co.,* 345 Pa. 559, 28 A. (2d) 913 (1942). This case is also reported in 143 A. L. R. 1417. Following this case will be found annotations on the question here involved, which discuss both of the California cases. Other annotations of interest will be found in 105 A. L. R. 1042; 4 A. L. R. 1560; 47 A. L. R.

150; 35 A. L. R. 921; and 104 A. L. R. 1033. In the Pennsylvania case urged by appellee, the action was for recovery of damages due to a piece of oyster shell which lodged in the plaintiff's esophagus and necessitated an operation for its removal. The trial court directed a verdict for the defendant, which on appeal was reversed and the cause remanded for a new trial. Plaintiffs in that case based their right of recovery upon a State statute, and the court there said that right of recovery was dependent upon the consideration to be given the statutory act in question. After a study of that case, we do not consider it persuasive in the case at bar. A review of the above case will be found in Temple University Law Quarterly, Vol. XVII, No. 2 (Feb. 1943).

It is generally considered that one who serves food to be consumed upon the premises, impliedly warrants the same to be fit and wholesome. Cases of this State and many others will be found in support of this rule in 35 A. L. R. 922. However, such warranty should be construed in the light of common knowledge with reference to the nature and character of the food being served. Certain fruits and relishes containing seeds, are commonly served. It is also common knowledge that bone is as much a part of the carcass of animals, fowl and fish as the meat. The bone usually remains with the meat during the process of cooking and preparation for human consumption. As said in the Iowa case, common experience dictates that one eating the meat of animals, fowl or fish, should do so with the knowledge that such food may contain pieces of bone.

In most of the cases dealing with this general subject, the principal question is usually found to involve that of an implied warranty of fitness. In a majority of such cases the unfitness of which complaint was made, was where the presence of foreign matter in the food, or the diseased, decayed or otherwise spoiled and poisonous condition of the food itself, was in-

volved. The instant case presents a situation involving the question of implied warranty of reasonable fitness of food for human consumption and whether such warranty is breached by the presence therein of a substance natural to the food being served, and not removed therefrom in the process of its preparation for consumption. The only cases we find dealing directly with this point are the three cited by appellant and the one cited by appellee. Reference has been had to the National Reporter System and the American Digest. No further cases were discovered. Although the rule that a restaurant keeper is liable for foreign substances in food served to patrons, and is held to impliedly warrant food to be fit and wholesome to be eaten, is well settled in this State, yet the precise question presented by this appeal presents a new situation. We do not believe the rule as established in this jurisdiction, exceeds an implied warranty that food served shall be wholesome and fit to be eaten. The importance of pure food to the public must not be ignored. Modern conditions require that establishments serving food shall be operated in a sanitary way and furnish food that is wholesome and fit to be eaten. However, such rule should be construed and applied in a reasonable manner, taking into consideration the common experience of life. When viewed in this light, it must be conceded that practically all meat dishes, whether they consist of beef, pork, fish or fowl, do contain bones peculiar to the food being served.

Appellant made motion for directed verdict at the close of the plaintiff's evidence, which motion was denied. A similar motion was made at the close of all the evidence, which was likewise denied. The action of the court in such respect is assigned as error.

We are of the opinion the rule upon which appellant bases its first ground for reversal is a sound and well reasoned one, and should prevail in cases of this character.

In view of this situation, appellant's motion for directed verdict was in order. The judgment is therefore reversed.

*Judgment reversed.*