(No. 71794.—

ELSIE M. JACKSON, Appellee, v. NESTLE-BEICH, INC., Appellant.

*Opinion filed March 12, 1992.*

HEIPLE, J., dissenting.

Marc A. Lapp, of Burroughs, Simpson, Hepler, Broom & Macdonald, of Edwardsville, for appellant.

William A. Mudge, of Lucco, Brown & Mudge, of Edwardsville, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Appellant, Nestle-Beich, Inc. (Nestle), appeals the decision of the appellate court reversing the grant of summary judgment in its favor in a personal injury action brought by appellee, Elsie M. Jackson (Jackson). (212 Ill. App. 3d 296.) We affirm.

## FACTUAL BACKGROUND

In May 1988, Jackson purchased a sealed can of Katydids, chocolate-covered, pecan and caramel candies manufactured by Nestle. Shortly thereafter, Jackson bit into one of the candies and allegedly broke a tooth on a pecan shell embedded in the candy. As a result, Jackson filed a complaint asserting breach of implied warranty (count I) and strict products liability (count II) against Nestle.

Nestle moved for summary judgment on the basis of the foreign-natural doctrine. That doctrine provides that, if a substance in a manufactured food product is natural to any of the ingredients of the product, there is no lia-

bility for injuries caused thereby; whereas, if the substance is foreign to any of the ingredients, the manufacturer will be liable for any injury caused thereby. *Mix v. Ingersoll Candy Co.* (1936), 6 Cal. 2d 674, 59 P.2d 144 (chicken bone in chicken pie); *Goodwin v. Country Club of Peoria* (1944), 323 Ill. App. 1 (turkey bone in creamed turkey dish).

In granting Nestle's motion, the trial court concluded that Illinois law is "that a food product is not rendered unwholesome by reason of inclusion therein of a substance natural to an ingredient" of the product.

In reversing, the appellate court thoroughly reviewed the rationales underlying the foreign-natural doctrine and the reasonable expectation test, which is applied in certain jurisdictions. The reasonable expectation test provides that, regardless whether a substance in a food product is natural to an ingredient thereof, liability will lie for injuries caused by the substance where the consumer of the product would not reasonably have expected to find the substance in the product. See, *e.g., Zabner v. Howard Johnson's, Inc.* (Fla. App. 1967), 201 So. 2d 824 (walnut shell in maple walnut ice cream).

The appellate court concluded "that the foreign-natural doctrine originally set forth in *Mix* and adopted * * * in *Goodwin* should not be followed." (212 Ill. App. 3d at 305.) The court determined that the doctrine was based on the faulty assumption that consumers know that prepared food products will or might contain whatever any of their ingredients, in a natural state, contain. Ultimately, the court held that the naturalness of the harmful ingredient of a food product does not absolutely bar recovery but is only one factor to be considered in determining whether the presence of the ingredient breached a warranty or rendered the product unreasonably dangerous. (212 Ill. App. 3d at 306.) We agree with the ap-

pellate court's conclusion that the foreign-natural doctrine is unsound and should be abandoned.

## NESTLE'S ARGUMENTS

In appealing the appellate court's decision, Nestle first asserts that the decision "has, in practice, created a strict liability situation[ ]" because the court "failed to change the general test" for determining the existence of a breach of warranty with respect to food products, *viz.*, the presence of foreign matter in the food or its diseased, decayed or otherwise spoiled and poisonous condition. (32 Ill. L. & Prac. *Sales* §152, at 463 (1957).) Nestle reasons that if, as the appellate court held, the naturalness of the harmful ingredient does not bar recovery, its mere presence will henceforth breach the warranty.

We are somewhat perplexed by Nestle's assertion that the appellate court failed to change the test of breach of warranty, with respect to food products, in light of Nestle's conclusion that, as a result of the court's decision, naturalness, the linchpin of that test, will no longer bar recovery. We would ask Nestle how that can be *unless* the appellate court's decision effectively changed the test. In addition, we find that test, as stated in Illinois Law & Practice, simply of no assistance to Nestle. That work cites *Goodwin* and it is the continuing validity of *Goodwin* which is at issue here.

Although not explicitly, the appellate court's decision does, effectively, establish the same test for both breach of warranty and strict products liability claims in food cases, as Nestle appears to argue. That test is the reasonable expectation of the consumer with respect to the ingredients of the food product involved. However, Nestle offers no sound argument for holding that the appellate court could not do so. Therefore, we find this line of argument completely unavailing to Nestle.

Nestle further asserts that the appellate court's decision "fails to acknowledge that the unique situation of natural food hazards is worthy of treatment different than other products[ ] *** by applying the foreign-natural doctrine, reasonable expectation test or some hybrid of the two[ ]" because "perfection in removing naturally-occurring substances is impossible on each and every occasion."

We do not find this argument to be a valid criticism of the appellate court's opinion. In so arguing, Nestle itself fails to acknowledge that the appellate court effectively adopted the reasonable expectation test as the measure of the viability of both breach of warranty and strict products liability claims in food cases. That is, the appellate court's decision does treat manufacturers such as Nestle differently than manufacturers of other products.

The crux of Nestle's arguments on appeal is that we should adopt the Louisiana version of the foreign-natural doctrine. In Louisiana, if injury is caused by a foreign substance in a food product, the manufacturer is subject to being held strictly liable. In contrast, if the substance causing injury is natural to the product or its ingredients, the manufacturer may be held liable only if the presence of the substance resulted from its negligence in the manufacture of the product. *Title v. Pontchartrain Hotel* (La. App. 1984), 449 So. 2d 677; *Musso v. Picadilly Cafeterias, Inc.* (La. App. 1965), 178 So. 2d 421.

We decline Nestle's invitation to adopt the Louisiana version of the foreign-natural doctrine in place of the reasonable expectation test. We agree with Jackson that the Louisiana approach comes too close to the outdated and discredited doctrine of *caveat emptor*.

Moreover, contrary to Nestle's implication in arguing for the adoption of Louisiana's approach, the appellate court's decision in the instant case is not the first to ex-

tend the modern-day doctrine of strict liability to food products in Illinois. In *Warren v. Coca-Cola Bottling Co.* (1988), 166 Ill. App. 3d 566, the court recognized that causes of action for breach of implied warranty, strict products liability and negligence properly lay against the manufacturer of an article of food or drink intended for human consumption and sold in a sealed container. Accordingly, the decision in the instant case does not impose burdens upon manufacturers of food products sold or used in Illinois which they have not previously borne.

Additionally, we must reject the underlying theme of Nestle's appeal. Nestle asserts that manufacturers of food products whose manufacture involves a risk that harmful matter which is natural to any of their ingredients will not be eliminated from the finished product should be exempted from strict liability due to the difficulty of eliminating such matter.

Preliminarily, we would note that this argument is essentially an argument for recognizing a state of the art defense in food product cases. However, in Illinois the state of the art has never been a defense to strict products liability. *Murphy v. Chestnut Mountain Lodge, Inc.* (1984), 124 Ill. App. 3d 508; *Gelsumino v. E.W. Bliss Co.* (1973), 10 Ill. App. 3d 604.

Moreover, we do not find that manufacturers of products such as Nestle describes serve so important a public service that they merit treatment substantially different from that of manufacturers of other products. In this regard, we believe the consumer's reasonable expectation as to the contents of food products, as the gauge of strict liability, adequately balances consumers' interest in defect-free products and such manufacturers' interest in reasonable costs of doing business.

With an awareness of that test, consumers and their attorneys need ask themselves only one question before deciding to bring an action of this type: Would a reason-

able consumer expect that a given product might contain the substance or matter causing a particular injury? If the answer is in the affirmative, we would expect that consumers and their attorneys would think twice about suing the manufacturer. Similarly, with an awareness of that test, manufacturers can act accordingly with respect to their means of production. Additionally, if the answer to the foregoing question is in the negative, we would expect that manufacturers and their attorneys would think twice about declining to offer a settlement of this type of action. The test thus provides a reasonable and concrete standard to govern actions of this sort.

Moreover, we believe that the fact that the reasonable expectation test comports with the rationale underlying strict products liability strongly recommends the test as the dispositive inquiry in this type of case. That rationale provides that an allegedly defective product must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. (Restatement (Second) of Torts §402A, Comment *i*, at 352 (1965).) The similarity between the language of the reasonable expectation test and the Restatement is striking and strongly recommends the former as the rule of decision in this type of case.

Nestle further argues that a fundamental basis of strict products liability, *viz.*, that manufacturers who create risks posed by a defective product and who reap a profit by placing it in the stream of commerce should bear the losses caused thereby, does not apply in this case. That principle does not apply, Nestle reasons, because the manufacturer of natural food products does not create the risk. Rather, the risk is created by nature

and all a manufacturer can do is its best to minimize the risk. We find this reasoning unpersuasive.

In so arguing, Nestle ignores that strict liability, in theory, is intended to apply to all products placed in the stream of commerce regardless whether they have undergone some processing or not. Accordingly, a supplier of poisonous mushrooms which are neither cooked, canned, packaged nor otherwise treated is subject to strict liability. (Restatement (Second) of Torts §402A, Comment *e*, at 350 (1965).) If such a supplier would be strictly liable for injuries caused by its product, we see no reason why Nestle should not be. Both would have sold a product which injured a consumer as a result of an aspect of the product's or an ingredient's natural state. In the mushroom supplier's case, that aspect would be their poisonousness. In Nestle's case, that aspect would be that the meat of pecans, an ingredient of Katydids, is found inside a hard shell. That Nestle actually processes the ingredients in its product before placing it in the stream of commerce and thereby has *some opportunity* to discover and eliminate the risk of injury posed by its ingredients, unlike the seller of poisonous mushrooms, actually militates in favor of, rather than against, imposing strict liability against Nestle.

Furthermore, we do not believe that Nestle's product merits inclusion in that group of products "which, in the present state of human knowledge," are "incapable of being made safe for their intended and ordinary use," *i.e.*, unavoidably unsafe products, and which are not subject to strict liability. Simply put, Nestle's product lacks the social utility of those products which justifies their exemption from such liability. Restatement (Second) of Torts §402A, Comment *k*, at 353 (1965); *cf.* Ill. Rev. Stat. 1989, ch. 111½, par. 5101 *et seq.* (exempting from strict liability those engaged in, *inter alia*, procuring, furnishing, processing, or distributing human whole

blood, plasma, blood products, blood derivatives and products, corneas, bones, organs or other human tissue for the purpose of injection, transfusion, transplantation in the human body).

Nestle also argues that two other rationales for strict products liability, *viz.*, that consumers cannot adequately protect themselves from defective products and that manufacturers such as Nestle are in a better position to identify and guard against potential defects, are inapplicable in this case. We disagree.

Rather than imposing an obligation upon consumers of Nestle's product to protect themselves by "think[ing] and chew[ing] carefully," we believe that the obligation of protection is better placed on Nestle and like manu-· facturers. In this regard, we agree with the following observation:

> "With the prevalence of processed foods on the market today and the development of technology in the food industry, consumers increasingly rely upon food processors to inspect and purify the foods they consume. Many products today are even packaged in such a manner that inspection by the consumer is difficult if not impossible. One might imagine a consumer in a jurisdiction that applies the foreign-natural test tearing away the crust from a beef pot pie to search for tiny bones, or picking apart a cherry-nut ice cream cone to remove stray shells or pits.
>
> In an era of consumerism, the foreign-natural standard is an anachronism. It flatly and unjustifiably protects food processors and sellers from liability even when the technology may be readily available to remove injurious natural objects from foods. The consumer expectation test, on the other hand, imposes no greater burden upon processors or sellers than to guarantee that their food products meet the standards of safety that consumers customarily and reasonably have come to expect from the food industry." Note, *Products Liability—The Test of Consumer Expectation for "Natural" Defects in Food Products*, 37 Ohio St. L.J. 634, 651-52 (1976).

With respect to Nestle's argument that it is in no better position than consumers of its Katydids to identify the risks associated therewith, we disagree that the common knowledge that pecans are hard-shelled nuts makes it common knowledge that processed foods containing pecan meats may also contain pecan shell. Moreover, contrary to Nestle's assertion, we do not believe that "the practical difficulties of food separation are common knowledge" to all consumers. As as result, we do not believe that consumers of its Katydids must be required to "think and chew carefully" when consuming them.

Nestle further argues that another of the rationales for strict liability, the difficulty of proving negligence, can be satisfied here by requiring the manufacturer to prove its freedom from negligence, as is done in Louisiana. We disagree.

Even if we had no doubt that that is the approach taken in Louisiana, we do not believe its adoption in Illinois would be salutary to our jurisprudence. We do not believe it wise to begin carving out exceptions to strict products liability by placing upon manufacturers a burden of proving freedom from negligence. If we were to find Nestle entitled to such treatment, we would be hardpressed to reject the arguments of any manufacturer for similar treatment. Eventually, the exceptions would swallow the rule of strict liability. We cannot countenance such a possibility.

Lastly, Nestle argues that another of the rationales for strict liability, *viz.*, that it is more effective than negligence liability in inducing the manufacture of safer products, also does not apply here given the nature of the product involved. We disagree.

Even under the reasonable expectation test of strict liability we approve in this case, manufacturers, such as Nestle, of products posing the risk involved in this case

can take one simple and relatively inexpensive step to make their products safer and to avoid liability for injuries caused thereby. Specifically, they can place an *adequate* warning to the consumer on their product's container of the possibility or risk of injury posed thereby. (Restatement (Second) of Torts §402A, Comment *j*, at 353 (1965).) The relative ease with which such a measure may be taken also militates in favor of holding manufacturers of such products subject to strict liability in the absence thereof.

In this regard, we note that, even if we agreed with Nestle that its Katydids merit classification as an unavoidably unsafe product, we would nonetheless find it subject to strict liability due to the absence of a warning of the unavoidable risk of injury it posed. See Restatement (Second) of Torts §402A, Comment *k*, at 353 (1965) (an unavoidably unsafe product is not defective or unreasonably dangerous when properly prepared and accompanied by proper directions *and warning*).

For all of the reasons stated herein, we affirm the judgment of the appellate court.

*Appellate court affirmed.*

JUSTICE HEIPLE, dissenting:

The majority decision overturns the long-standing doctrine in Illinois regarding the sale, purchase and consumption of food products. Since 1944, Illinois has followed the so-called foreign-natural doctrine. (*Goodwin v. Country Club of Peoria* (1944), 323 Ill. App. 1.) Stated in its simplest terms, the foreign-natural doctrine provides that the vendor of food is not liable for injuries due to unremoved but naturally occurring ingredients such as nut shells, fruit pits, fish bones and so forth but is liable for foreign objects in the food such as glass shards or pieces of metal. The majority opinion in the instant case discards the foreign-natural doctrine and substitutes the

reasonable expectation test. In its essence, that test provides that the vendor of a food product is liable for injuries caused by an ingredient in the food whether natural or foreign whenever the consumer of the product would not reasonably have expected to find the substance in the product.

In truth, the reasonable expectation test is what gave rise to the foreign-natural doctrine. That is to say, since it would be reasonable to expect to find a nut shell in a product containing nuts, there would be no liability. Rather than approach each broken tooth or other injury on a case-by-case basis, it was deemed more expeditious and efficient to crystallize the matter into the foreign-natural doctrine. That doctrine both did justice and promoted judicial economy.

A reversion to the reasonable expectation test simply means that each food-related injury in this State will be subject to a lawsuit to determine whether the consumer's reasonable expectation was violated. The costs will be significant, first to the manufacturers and second to the consuming public. It is axiomatic that all production costs eventually end up in the price of the product. Additionally, if the costs exceed profitability, the product leaves the market place altogether and the consumers lose choice, selection and availability of products.

The effects of this decision will go far beyond the defendant Nestle-Beich Company, whose candy caused a broken tooth. It extends to all manufacturers and purveyors of food products including the neighborhood baker, the hot dog vendor and the popcorn man. Watch out Orville Redenbacher!

The continued march towards strict and absolute liability for others (others meaning anyone not injured who has assets) and the absence of any responsibility by the injured for their own welfare takes yet another step with this majority ruling. Accordingly, I dissent.